Good morning, ladies and gentlemen. We are fortunate to have Judge Singleton from Alaska sitting with us today. Welcome, Judge Singleton. Thank you, sir. We'll hear first the case of Hydra Media Corporation v. Hydra Media Group. Counsel? Good morning, Your Honors. My name is Serge Sonny. I'm with the Sonny Law Firm, and I represent the plaintiff in the case below, the appellant today. Your Honors, what's before the court is a series of four orders by the district court that, when taken together, are hopelessly inconsistent. They're internally inconsistent, they're inconsistent vis-a-vis each other, and the problems that manifest from these orders are errors of law and errors of fact. A fundamental misunderstanding about the strength of trademarks and how they apply, and a misunderstanding and misconstruction of the type of trademark that was at issue. In this case, really, it's service mark between the parties. The saga begins in August of 2007 on cross-motion for summary judgment. The plaintiff was a common law trademark owner of the Hydra Media Mark since 1996. It obtained a federal registration for the Hydra Media Corporation Mark in 2000. The defendant adopted Hydra Media Group in 2003. It was clearly a junior user. The defendant acknowledged that the plaintiff had common law rights in the Hydra Media Mark. The defendant did not begin to use Hydra Media Group as a mark, as a trademark, to identify goods or services until 2004. Made a public announcement about its intended use in April of 2005. The plaintiff discovered the defendant's use in May of 2005 and immediately gave notice of its belief that the defendant was committing trademark infringement. A cease and desist letter went out. Rather, an owner's one that pointed out the consequences of trademark infringement, a request and a demand that they cease immediate use, identify their uses, and so forth. The court, in analyzing this case, recognized correctly that the three most important factors in an Internet case are the similarity of the marks, the relatedness of services, and the fact that they simultaneously use the Internet as a marketing channel. All of these, the court found, favored the plaintiff. Summary judgment of infringement was found for the plaintiff. But in the course of that, the court characterized the plaintiff's trademark, in analyzing both the plaintiff's and defendant's trademark, as suggestive when in fact it is arbitrary. The distinction is significant. A suggestive mark brings to mind the nature of the goods and services being offered. An arbitrary mark is one that is a construct of English language words that has no relationship to the goods and services of the parties. In this particular case, the mark is Hydra Media. Hydra and Media bring to mind lots of things, but they do not bring to mind immediately or suggest that the business is necessarily involved in Internet marketing and advertising services. It simply doesn't do that. Let me ask you this. There's no question there was an infringement. You obtained an injunction. You won an injunction. Correct. The point of contention, as I understand it, is whether the other side is exempt from having to pay profits on the grounds that their infringement, though infringement it be, was not willful. That's correct. They say they consulted with counsel and relied in good faith, mistakenly, but in good faith on the advice of counsel. That's basically what I understand to be the linchpin of Judge Pregerson's logic. I think that's right. Why is he wrong about that? Certainly. Firstly, and I'll come back to this later, the court granted an injunction, but the injunction the court granted is too narrow. It does not comport with the standard for an injunction under the Lanham Act. It doesn't either remedy the infringement or avoid the likelihood of continuing infringement, and I will address that further in a moment. What Judge Pregerson said was that the defendants, plaintiffs had not shown that the defendants intended to deceive. That's not the standard required for a finding of willfulness. Wasn't it more that they intended to benefit from a competitor's product or to create confusion? That is also an alternative articulation that he made, and those two are standards that are applied regularly in a trademark infringement case, but there is also the standard that's applied in reverse confusion cases, which are also trademark infringements. In those cases, a junior user adopts the mark of a senior user not to take advantage of the goodwill and reputation of the senior, but to usurp a mark and to take it away. It is not an intention to deceive, but to take away the very mark. The DreamWorks case is seminal. It came from this court, the Ninth Circuit, and it recognized that in the case of a junior user adopting a senior user's mark not for an intent to deceive or an intent to take advantage of the goodwill or reputation of the senior. It is nevertheless still a trademark infringement. It is still a usurpation of a property interest of the plaintiff, of the senior user, and it does erode the recognition that may have existed for the plaintiff. We all agree that it was an infringement. Judge Pregerson agrees it's an infringement. The question is, do you get profits or do you just get an injunction? Let me address that. The court initially applied a standard that was inconsistent with the standard that this court has announced for willfulness. There are many articulations for it, but it is conduct that doesn't rise to the standard of the appropriate degree of care. The Lanham Act creates a system by which the world is placed on constructive notice of the rights of a senior user. The court finds that there was, if not willful blindness, at least a lack of due diligence, and it is admitted and acknowledged that the defendant did not conduct a search before they first used the mark. So, counsel, you're telling us that a proper interpretation of Ninth Circuit law is that common law negligence is the equivalent of willfulness. The standard is objective recklessness or objective unreasonableness. It is perhaps a little bit more than common law negligence, but it is significantly less than an express intent to deceive or fraud. Well, I was going to ask you about the Ninth Circuit standard. The Ninth Circuit standard is really set forth in Lindy, isn't it? I'm sorry. The Ninth Circuit standard is set forth in Lindy and is the intent to benefit from the competitor's product, isn't it? Lindy certainly announced that. That standard under the Ninth Circuit has evolved over time, and it is not limited to an intent to benefit from a plaintiff's product. The DreamWorks case is seminal in that regard, and I urge the court to look to that. The court said defendant didn't act willfully, and the Honor pointed out it was in part because of a claim of reliance on advice of counsel. But the standard for reliance and advice of counsel is not whether you asked or received the advice, but whether it was reasonable to rely upon the advice. In this particular case, the unequivocal record, uncontroverted record is the defendant had notice of a possible infringement. Their own employees told them they had concerns that this might be a problem. The in-house counsel was concerned enough that he reached outside to somebody specializing in trademark law, had a brief conversation, was informed by outside counsel that a more thorough investigation ought to be done. He did not retain counsel. She did not provide an opinion. But he independently, without applying the factors that are regularly to be applied in trademark cases, concluded that there was little risk, and then proceeded. Now, what exactly does that mean, and is that excuse, and is that a sufficient excuse to proceed? That, we maintain, is willful blindness. That is strong evidence, uncontradicted evidence, that they had expressed knowledge of the plaintiff's mark, of the risk with respect to it, chose not to conduct the investigation, and chose to proceed. Counsel, so we're to understand, then, that you treat in-house counsel as the party. You don't view in-house counsel as a lawyer advising the party. We view it as both. If you view the in-house counsel as the party, then I've already described the facts. If you view them as counsel and fact, then the question of advice to counsel turns, in large part, on the extent and appropriateness of the investigation. We've all known that simply providing a sham opinion is not supporting advice to counsel defense. In order for advice to counsel to function as a defense, to the facts and circumstances, sufficient for counsel to conduct a reasonable investigation, research in fact, and the delivery of a reasoned opinion, supported by analysis and explanation for the conclusions. None of those occur, whether you treat in-house counsel as counsel, or you treat them as a client and consider the outside counsel as counsel. It didn't happen in either case. It did not disclose the full, didn't conduct an investigation and disclose the full extent of the plaintiff's business. It didn't consider the extent to which there was going to be overlap in customers, overlap in marketing channels, the nature of the use, the implications, the potentials for expansion, the similarities of the mark, and analysis of the strength of the mark. None of those things took place. I wouldn't think you'd need counsel if you disclosed all of that, the analysis of the similarity of the mark. Isn't that counsel's job to check when you know there are two marks, he knows what they are, he knows what the business is? Absolutely, it is counsel's job to check, and it didn't happen. Well, then if you view counsel not as the party, but as counsel, then what's the party's feeling? Well, the party would certainly have brought to the attention of counsel that there is an issue, that there is another company out there using this mark. At that point, presumably in-house counsel is already aware of the defendant's business and what its intentions are, but in-house counsel doesn't know anything, and neither does the party, about the plaintiff's use, the plaintiff's business, and it would have been appropriate and necessary for an investigation of that to occur. The cases are all uniform in that regard. The Federal Circuit has addressed it in the context of patent cases where advice to counsel is regularly asserted as a defense to willful infringement, and they've said you can't simply rely upon sham advice. You can't withhold information from your counsel, and you can't misrepresent facts to your counsel, and your counsel can't provide an opinion that isn't a result of reasoned analysis. In this particular case, I suspect they told them as much as they knew, and the rest of the job should have been done by counsel, whether outside or inside, in terms of the investigation and the analysis, a thorough understanding of the landscape of the marketplace, of the businesses of the parties, and then an application of fact to law, with an understanding of what the trademark law requires. Excuse me, I didn't mean to step on your words there. Let me ask you, what's wrong with the scope of the injunction? Did Judge Pregerson enjoin them from any use of the word hydromedia as one word? The Lanham Act provides that it is actionable for the use of an infringing mark or a colorable imitation of it. That language has been regularly applied as confusingly similar in all cases, and virtually every injunction that applies, you must protect not only the mark as registered, but all colorable imitations of it and any mark confusingly similar to it. In this particular case, Judge Pregerson refused to do that, and he did so. Was there a variance with the word hydra? Yes. Okay, he had his reasons for that. You know what they were. Why was he wrong about that? He said you didn't complain about it soon enough. He says, I agree fully that hydra, hydra network, and all these other hydra-related marks used by the defendant are too close. They're not a safe distance away. They are confusingly similar. They would be infringing. They are infringing. He found that. He then says, I'm not going to grant an injunction, however, because you didn't complain soon enough. That conclusion is not supported by the evidence. Plaintiff first found out about the defendant's uses in 2005. They notified the defendant of their objections immediately. At that time, there is no evidence in the record that the hydra alone or the hydra-related marks were actually being used as trademarks. Hydra Media Group at that time was being used as a company name for a holding company. Linkstrak was the mark that was being used for the related services. In your cease and desist letter, did you make any reference to these other hydra? During the course of the litigation, I believe in the context of our second summary judgment motion. He said that was too late. He said that was too late, and we were of the belief that having asserted claims of infringement against the defendant, having established infringement, in fact, having been entitled to the remedies under the Lanham Act, that that would have been sufficient to stop the defendant from using all colorably similar marks. The court, however, took a different view and said that we acted too slow and too late. Mind you, laches, estoppel, waiver were not raised by the defendant in its answer. They are affirmative defenses. They are waived if not raised. The court sua sponte raised these issues. There was no development of the record to support any of those arguments as to laches. How more quickly can you proceed other than to notify the defendant when you find out about their uses? We did not know sufficient information about the defendant's uses of the hydra-related marks in connections with their goods and services. Let me give you an example, if I might. If there is a company out there using hydra media for the production of floaties, children's floaties for swimming pools, that's a use. It's a use in commerce. It's a use in commerce in connection with products. It's a trademark use, but it's not one that we legitimately have a right to complain about. It's completely different products. It's a completely different class. There's no likely overlap between markets or consumers, and there's no likelihood of confusion. The fact that defendant is a diverse company with lots of different products and different enterprises that they ran and had some hydra-related marks that they had adopted was not sufficient grounds for us to object that those uses were a trademark use that was going to be infringing. We had to have a good faith basis for asserting a claim. As to hydra media, it was clear. If you're right about this, what would you have us do? Have him go back and add the hydra variance? Yes, you'd go back and amend the injunction to conform it to the scope that the Lanham Act calls for. It would be an injunction against the plaintiff's mark and any colorable imitations thereof. That would extend by the court's own findings to the hydra-related marks. And that would solve the problem in terms of the scope of the injunction. We need to go back to the court as well and address the problem of the inconsistencies and the errors of law with respect to the question of whether we're entitled to an accounting of the profits. Clearly, it's a question of willfulness. That means scienter. Scienter questions are hardly ever able to be resolved on summary judgment. There was ample evidence here that should have allowed this to go to a jury. We had evidence of a failure to conduct a reasonable investigation before use, a use after notice, a use after a judgment had issued of infringement for eight months that the court finds troublesome and then forgives because you didn't complain soon enough. That's inappropriate for a court to do when the defendant hasn't raised it in the answer. It's waived. And in real terms, while the court has the right and the duty to apply principles of equity, it cannot and should not apply those principles to deprive a victim of a remedy, one that has already been found to have been victimized. And the net result of this is the total usurpation of the goodwill and the reputation of the plaintiff. That's a finding the court made expressly. The defendant's use destroyed the plaintiff's reputation and goodwill. Counsel, is it a fair inference that your case rises or falls on the characterization of this case as falling under DreamWorks that unless we find that this is this reverse occupying the field, you lose? No. Under any articulation of the trademark laws, the standard for infringement has already been established. But the issue is willfulness. And in response to Judge Reinhart's question, you, I thought, acknowledged that the overriding view of the Ninth Circuit is intent to deceive or cheat. And you're contending, as I understand it, that in DreamWorks the court carved out an exception to that general rule to cover only a particular kind of case in which willfulness is given a much more liberal interpretation, some form of recklessness or gross negligence. That's not quite correct. The standard as articulated under Lindy has been the standard for many, many years. What DreamWorks and other cases, all the way from the Supreme Court, have recognized that the concept of willfulness is not so limited as requiring a malicious intent to injure and to usurp. It is sufficient to have the objectively reasonable or objectively reckless standard. So you're saying the general rule now is recklessness, and you're defining recklessness down to be a kind of gross negligence. Correct. If I may reserve whatever little I have. Good morning. Edward Schwartz of Christie, Parker & Hale on behalf of Defendant Hydromedia Group. I'd like to address a couple of the points that Mr. Sony raised. One of the most egregious of which is his allegation that they were not aware of my client's use of Hydra in 2005, that they only learned of it later. What makes this egregious is they submitted to the district court and to this court documents showing use of Hydra, not only as a trademark, just as the title of the page. And I accused them before Judge Pregerson of having doctored the documents. It became clear when they looked at the real document that they had used a document that didn't show the reality, the real usage, and they apologized and the district court found it to be inadvertent. They're relying on that very same incomplete document here. If it's referenced on page 29 of their brief, they are referencing a document that's shown at pages 175 to 180 of the appendix. The real, full document that they admitted to the district court was accurate is shown in the appendix on page 29 of their brief. And it clearly shows use in 2005, not only of Hydra Media, but of Hydra Network, Hydra E-Response, and Hydra Commerce as service marks. It's undeniable, unless you don't use the correct document. That's the first thing. With regard to the issue of the behavior of my client when they learned of my client's use of Hydra in 2005, I'm not going to go into the details of that. I'm going to go into the details of the behavior of the plaintiff. First of all, they adopted Hydra Media in 2003. It's uncontroverted that they didn't know of the defendant at that time. They want to shift the time to 2005, but that's not the case. When this case started, there had been a cease and desist letter only with regard to Hydra Media. There had been a complaint that only mentioned Hydra Media. In the early stages of the case, there was a joint rule 26 report, joint report to Judge Pregerson. They stated that the basis of their claim was defendants' use of Hydra Media since 2003, not since 2005, since 2003. In 2003, they didn't know anything. The plaintiff was unknown to the defendants. In 2005, they didn't know anything. We didn't submit the advice of counsel as a defense. It's to willfulness. It was put not in the willfulness as defined by the Ninth Circuit. It's uncontested. There wasn't any bad faith by the defendants, so they want to lower the standard to objective recklessness. They're relying on the patent standard. It is the standard in a lot of other circuits. The question is whether our standard has become the standard in other circuits or whether we're sticking with our stricter standards, which is the intent to benefit from the competitor's product or to create confusion. Even under the objective recklessness standard, Judge Pregerson made an analysis under both standards, and he found there was no objective recklessness. He said what the defendants did is when they received notice, they did an internal search, the in-house counsel and an officer of the defendant looked at the defendant's website, looked at the defendant's registration, and came to the conclusion that they were in different businesses. Later on, when they received, and defendant's counsel spoke to outside counsel, when they received the cease and desist letter, it only related to Hydro Media. At that time, defendant's president did the same investigation, looked at their website, looked at the registration, and said we're in different businesses. We've been in business now for several years. We've never even heard of these guys. No one's being harmed. And they made a business judgment that there was no infringement. Now, Judge Pregerson ruled they were wrong, but that's not objective recklessness. People make business judgments. They were wrong. Well, if the distinction between negligence and recklessness in context is knowledge and appreciation of the risk, then the test would be whether your side was aware of a significant, substantial risk that their actions were going to be harmful to a plaintiff and proceeded. And it's your contention that there's nothing in the record that would support that inference? to determine if they thought that there was a problem. There was obviously a similarity in the marks, but they weren't in the same business. If you look at the defendant's registration, they were constructing websites for others. That's what their website showed them doing. Now, it turns out that they also may have wanted to do something else. They're in the website design business. What does your company do? They put advertisers together with people who have websites. It's pretty close, isn't it? I mean, it's not like they're in the meatpacking business. I mean, it's an Internet business. There are a lot of things on the Internet. This was a service. Sketchers was one of their clients, wants to advertise on other people's websites. So they would come to my client, who had contacts, and said, okay, at these other people's websites, they'd let them do banner campaigns on them. That was their advertising service. They didn't make anything. They just put together someone who wanted to do advertising with somebody who allowed the advertising. But they sure weren't making websites or building websites for people. That's a totally different field. And that was their conclusion. Now, the court found that they were wrong. But they made a business judgment. That's not willful infringement. They certainly didn't intend to take away the name from the defendant because at the time they chose Hydromedia, they didn't know of them at all. They chose Hydromedia two years earlier. Is your client still using the other Hydro terms? No, I guess is the short answer. There's a long, drawn out answer, but no. If you're not, what's the short answer? Well, who then is the defendant in this case? The defendant is Hydromedia Group. That's who was sued, went all the way. And you're saying Hydromedia Group has gone bankrupt? Yes. So there's a trustee or something? Hypothetically, if we ruled in their favor and sent it back for profits, what would happen? There are no profits. The reason they went under was because of the economy. But they're not entitled to it. I'm not saying they are. I just don't understand the twist that this case has taken. I don't know what happens then. Did anyone assume their liabilities? No. No. So if there were now a judgment against them, nobody could satisfy it? I'm not in bankruptcy law or that thing, but that would be my understanding. The estate's closed? Yes. So you couldn't answer whether any claims established or in court of the plaintiff or the appellant in this case, you couldn't answer for us whether those were discharged in the bankruptcy? No, I cannot. And the party that would be hurt by an encroaching injunction is the party that has acquired the assets? Correct. To your knowledge, is anyone anywhere in reliance on the rights of the former Hydra group using any of those? Yes, they're using Hydra, Hydra Network. At the very least, those, because I know the registrations, those marks are registered trademarks, were assigned, and they are using it, those marks. You don't represent those folks? No, I don't. Do you have anything else to say? I actually did have some points with regard to these that haven't been raised by the court. Well, let me ask you, do you have any interest, does your client have any interest in what happens to the injunction? To the extent that it would affect their sale of the assets to this third party, yes. You mean your client, which now is out of business and has no assets, might be sued by the third party? I guess that's possible. Well, it's possible, I guess, that the third party ought to be a party to this appeal, but I don't know. But as to the, well, you don't know whether any claim against the non-existent party might have survived the bankruptcy, but you said there's no party left. Okay, well, I think that's an interesting addition to this appeal. Yes, well, there's time if you have something that you think is going to affect your client. The only thing that would affect would be our request for attorney's fees for the plaintiff's unclean hands. And with regard to that, they certainly have never denied the actions we accused them of, specifically alleging, misusing the registration symbol and saying that Hydromedia was a registered trademark. Their defense is that it didn't affect anything at issue in the lawsuit because this only occurred in 2007 and 2008 after entry of summary judgment. If you're right and you're entitled to fees, who would get the fees? My law firm, actually. They owe us a lot of money. Which is similar to their request for attorney's fees. If they're requesting attorney's fees, although they allege that it's unfair for the plaintiff to incur these hundreds of thousands of fees, they have it on a contingency. Any award of fees goes to their law firm. It's not to the principal. Well, I would hope that attorney's fees end up with the attorneys. But if the entity doesn't exist, I mean, the judgment would go to... Would go, presumably, to the entity and winding up business and... You would hope to get your hands on it. I would hope that it would end up with us. Thank you. Thank you. I have to say, Your Honors, this is the first time I've heard of a bankruptcy. We never received any notice of the filing of a bankruptcy. We're clearly a claimant entitled to notice. We should have been listed as contingent, disputed, unliquidated on their schedules. No notice of automatic stay. Nothing at all until this morning. So I don't know anything about this. I think I received a Google alert just yesterday or the day before about the acquisition of the business. But I thought that was an ordinary course of business that they sold the business. Well, now that you know about it, what would you like us to do? Do you want us to hold it for a while or do you want to talk with Mr. Schwartz? Do you want us to go ahead and adjudicate the appeal or what? I think you need to adjudicate the appeal and we'll go back. And if the circumstances are as Mr. Schwartz represents, there's a whole set of new issues that are created about failure to give notice in the bankruptcy proceeding, whether or not that has impact on transfers of assets, all kinds of other problems. But our client uses this mark. It's important to them. Somebody out there claims to have purchased this mark and plans to use the hydro-related marks. Maybe. We don't know anything about their intent, what their business structure is going to be or anything else. Where we are today is we established infringement. We were looking for an award of an accounting and a recovery of attorney's fees. We were denied that, and the denial was on a summary judgment motion that, frankly, did not construe the facts and the evidence in favor of our client, construed it against inappropriately, and decided questions of state of mind, latches, waiver and estoppel, questions of fact that should have been reserved to the prior fact. Those need to go back for a determination. At the end of the day, Your Honors, I suspect if it is true that there is no business and there are no assets, the case will probably resolve itself. But as we sit here today without anything in the record that they've ceased to do business without us ever having received notice about a bankruptcy, we just don't know. We don't know whether the assets fraudulently were conveyed to the principals and are now in the hands and pockets of those people. We just don't know. What they did represent to the court and to us during discovery, millions of dollars were received and earned by them. They had practically no cost of sale in connection with an Internet business. They were making tons of money. And we suffered an infringement and got no remedy. That's wrong. Thank you, Your Honors. Thank you. Thank you very much. The case just argued will be submitted. The court will take a recess before hearing the next case. All rise. This court stands in recess. Thank you.
judges: Singleton, Reinhardt, Silverman